# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SEP 25 2025 PM1:36
- USDC - FLMD - TPA

JONES ADEWALE EBENEZER, a pro se
litigant and dismissed OMS II 2026 student
of the Nova Southeastern University Kiran C
Patel College of Osteopathic Medicine,

**Case No:** 8:25-CV-02595-MSS-NHA

**Jury Trial: Yes** √

     Plaintiff,

       vs.

NOVA SOUTHEASTERN UNIVERSITY,INC.

     Defendant,

## COMPLAINTS FOR A CIVIL CASE

## I. The Parties to these complaints

### A. The Plaintiff

1. Dr Adewale Jones Ebenezer
   801 21st Street,Apt 2,
   Ambridge, Pa. 15003.
   (727) 967-9595
   docadejones@icloud.com

### B. The Defendant

Nova Southeastern University,Inc
3300 South University Drive Davie,
Broward County. Florida. 33328
800-541-6682, 9542622159


TPA
73020

## II. Basis for Jurisdiction

Under 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1391(B) And U.S.C § 1367.

√ Federal Question.    √ Diversity of Citizenship

These claims differ from prior Case No. 8:25-cv-00121-TPB-AAS (procedural dismissal on August 27, 2025), focusing on new statutory violations and continuing harm, including the September 18, 2025, FERPA request.

1. Federal Questions

1. Wrongful Dismissal. Nova Southeastern University Kiran C Patel College of Osteopathic Medicine 2023/2024 Handbook. Pp 173 & 174.

2. Violation of Title VI of the Civil Rights Act of 1964 (Intersectional). 42 U.S.C. § 2000d Et Seq.

3. Violation of Title VII of the Civil Rights Act of 1964 (Intersectional). 42 U.S.C. § 2000e Et Seq.

4. Violation of Title IX of the Education Amendments of 1972. Sex Discrimination and Harassment. 20 U.S.C. § 1681 Et Seq.

5. Violation of Section 504 of the Rehabilitation Act of 1973. Perceived Disability Discrimination. 29 U.S.C. § 794.

6. Title VI of the Civil Rights Act of 1964, Codified at 42 U.S.C. § 2000d Et Seq. Religious Discrimination and Harassments.

---

*Intersectional Includes but Not Limited to Race, Sex, Age, Religion and Nationality.

7. Ku Klux Klan Act of 1871. Civil Rights Conspiracy Under 42 U.S.C. § 1985(3)

8. Violation of Title I. 42 U.S.C. § 12111 Et Seq.)

9. Age Discrimination Act of 1975. 42 U.S.C. § 6101 Et Seq.

10. Violation of Bodily Autonomy. 42 U.S.C. § 12101 Et Seq.

11. Count 9: Willful Negligence/Violation:

   a. 20 U.S.C. § 1681 - Title IX of the Education Amendments of 1972.

   b. 42 U.S.C. § 2000e-5(G).

   c. Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000d.

   d. 29 U.S.C. § 623.

12. Breach of Contract (Florida Common Law - Supplemental Jurisdiction).

13. Defamation (Florida Common Law - Supplemental Jurisdiction).

14. Intentional Infliction of Emotional Distress (Florida Common Law - Supplemental Jurisdiction)

15. Violation of FERPA (20 U.S.C. § 1232g) - Injunctive Relief to Enforce Compliance.

2. Diversity of Citizenship

 A. Plaintiff,Jones Adewale Ebenezer is a citizen of Ondo State, Nigeria.

 B. Nova Southeastern University,Inc. Is incorporated under the laws of the State of Florida and has its principal place of business in Florida.

3. Venue is proper in this Court

 As the events giving rise to the claims occurred in Clearwater/Pinellas County, which is within the Middle District of Florida, Tampa.

4.The Amount in Controversy

 Indebted to the United States Government to the tune of $265000 in student loans minus the accruing interests which was expended for my tuition and upkeep while a student of Nova Southeastern University. Also, the possibilities of earning up to an average of $1000000 in annual income as a Surgical Oncologist, my dream career is damaged.

## III. Statement of Facts.

1. I, Jones Adewale Ebenezer, a minority, underrepresented, protected class, black male who was enrolled as a medical student at Nova Southeastern University (NSU), Kiran C. Patel College of Osteopathic Medicine, Tampa Campus, from July 18, 2022, until my dismissal on December 15th, 2023. I also worked as a Public Safety Officer at the same campus during this period.

2. In June or July 2022, Plaintiff was admitted to NSU's medical school following interventions by Professor Elaine Wallace and Mr. Daniel Alfonso.

3. This admission decision caused resentment from certain members of NSU's Administrative Department.

4. From Plaintiff's first examinations in Anatomy and Biochemistry in 2022, NSU's Administrative Department singled him out due to his age/race.

5. Plaintiff was physically separated from his classmates during these examinations and made to sit in front, apart from other students.

6. Despite this treatment, Plaintiff earned distinctions in both courses, which carried 6.5 and 5 credit units, respectively.

7. On April 20, 2023, due to difficulty finding peers to practice Osteopathic Principles and Practice ("OPP"), Plaintiff set up a practice tent behind the school to attract volunteers.

8. After three hours without volunteers, Professor Kenneth Johnson approached Plaintiff.

9. Professor Johnson stated that five Administrative Department members had emailed complaints about the tent.

10. Professor Johnson offered to let Plaintiff practice OPP with him in his office.

11. Professor Johnson acknowledged potential racial discrimination by the Administration.

12. Professor Johnson had previously warned Plaintiff to be cautious of the Administration.

13. Plaintiff removed the tent because it offended the Administrative Department.

14. Weeks later, Plaintiff's classmates set up a similar practice area at the same location without issues.

15. A Black female administrator in her late 30s monitored Plaintiff during a practice session with classmates, creating an intimidating environment.

16. Plaintiff lived with a classmate, Miles Horton, who agreed to practice OPP with Plaintiff but later reneged.

17. Horton deceived Plaintiff the night before his first OPP examination in 2022.

18. Plaintiff later discovered Horton was practicing with others in paid tutorials, costing Plaintiff $240 per session to join.

19. Horton called Plaintiff "crazy" at least five times.

20. Horton liked a GroupMe message by classmate Matt Spear stating, "Don't you get it? We don't want you in this class," in August or September 2023.

21. This message was liked by approximately 40 of 150 classmates.

22. Plaintiff was socially isolated and attended school biweekly for examinations.

23. Plaintiff struggled to find study partners.

24. When studying on campus, young female schoolmates would linger around Plaintiff and act disruptively.

25. In his second year (M2), Plaintiff connected with two new Black male M1 students.

26. The Administration denied Plaintiff a "small" (mentee) from the M1 class, citing a prior punishment.

27. This denial occurred despite Plaintiff having had a "biggie" (mentor) as an M1 student under similar circumstances.

28. On September 18, 2023, Plaintiff lent his OPP practice table to an M1 student, Wayne Delice.

29. Plaintiff arranged to retrieve the table near his apartment, a three-minute drive from campus.

30. While waiting for 45 minutes, a white woman approached Plaintiff's truck.

31. She knocked on the window and asked if there was anything she needed to do for him.

32. This occurred despite her standing in 84-degree Florida heat while Plaintiff sat in his air-conditioned vehicle.

33. Plaintiff declined, took her photograph, and Wayne arrived shortly after.

34. Wayne unsolicitedly discussed white women at school and his own relationship.

35. Plaintiff's examinations were often unnecessarily difficult.

36. Plaintiff employed a strategy of downloading and deleting exams via ExamSoft to ensure randomization.

37. Plaintiff received a warning from ExamSoft prohibiting this practice without a letter from the school.

38. On September 19, 2023, Plaintiff took an Endocrinology examination while ill with COVID-19.

39. Plaintiff contracted COVID-19 from a classmate, Aaron.

40. Plaintiff lacked access to a primary physician to postpone the exam.

41. The exam was poorly formatted, with unreadable diagrams and ambiguous questions.

42. This led to Plaintiff's failure—the only exam he failed outside OPP, carrying 3 credit units.

43. In OPP examinations over 17 months, Plaintiff consistently struggled due to lack of practice partners and biased grading.

44. Each OPP exam included three tables worth 15 marks each, totaling 45 marks extrapolated to 100.

45. Requesting a tip cost 3 marks but could significantly improve scores.

46. Plaintiff received a tip only once, passing that exam.

47. Plaintiff was otherwise denied tips, even when requested.

48. This contributed to repeated failures.

49. In April or May 2023, Plaintiff sought a new roommate from the M1 class due to orchestrated differences with Miles Horton.

50. Plaintiff posted in the M1 GroupMe, offering tutoring in Anatomy and Biochemistry (where he earned distinctions) and to act as a standardized patient for OPP practice in exchange for shared accommodation.

51. Neal Patel responded.

52. Plaintiff sent Patel a private message jokingly stating that medical school is a game and he was Patel's "cheat mode."

53. Subsequently, Plaintiff received messages from an individual named Brod via NSU GroupMe, soliciting cheating.

54. Plaintiff reported and deleted these messages.

55. Plaintiff received this message again 5 days later.

56. Plaintiff posted it in the class GroupMe to inquire if others received similar messages.

57. NSU did not investigate Brod.

58. NSU used Plaintiff's "cheat mode" comment and this incident as evidence of encouraging academic dishonesty.

59. This contributed to Plaintiff's dismissal.

60. On November 10, 2023, Plaintiff was notified of a Student Progress Committee ("SPC") hearing scheduled for November 16, 2023, for dismissal.

61. Plaintiff faced three SPC hearings—one for suspension and two for dismissal.

62. These hearings were strategically timed before or after major examinations to increase the likelihood of failure.

63. Despite being tried for nonacademic reasons, Plaintiff was dismissed for academic reasons.

64. At the time, Plaintiff was in good academic standing.

65. Plaintiff's final transcript cited "Academic Dismissal."

66. Plantiff avers there are other discriminatory behaviors from male professors with academic impacts.

67. As a Public Safety Officer starting July 18, 2022, Plaintiff faced harassment from Dr. Shane Lam.

68. In the second week, Lam questioned Plaintiff about asking a student-employee out, which Plaintiff denied.

69. Lam accused Plaintiff of violating Title IX without reading him his Miranda rights.

70. Lam forced Plaintiff to retake a Title IX course.

71. Lam alleged Plaintiff fraternized with a student, though Plaintiff was also a student-employee.

72. A Black student witnessed Plaintiff's conversation with the individual in question.

73. Days later, Lam called Plaintiff and stated he "stink," damaging Plaintiff's self-esteem.

74. Four weeks later, Lam falsely accused Plaintiff of missing work, despite evidence Plaintiff worked an extra 16 hours.

75. Six weeks later, in late August 2022, Lam accused Plaintiff of threatening a coworker, Peter Chaplinsky.

76. Chaplinsky had verbally abused Plaintiff for weeks, calling him "piece of shit" and telling him to "shut your mouth."

77. Another coworker, Peter Schroeder, and others also mistreated Plaintiff.

78. Plaintiff reported these incidents via Omnigo and work email without response.

79. Coworkers Ahmed and Stacy-Ann Payne warned Plaintiff of a plot against him.

80. A Mexican-American coworker objected to Plaintiff's mistreatment but was removed from the site shortly after.

81. On August 25, 2022, Chaplinsky demanded a ride on Plaintiff's golf cart while patrolling.

82. Plaintiff explained he would pick Chaplinsky up after completing his route.

83. Chaplinsky insisted, so Plaintiff drove away.

84. Plaintiff attempted to resolve the situation peacefully.

85. Chaplinsky called Plaintiff a "piece of shit."

86. Plaintiff responded calmly, referencing cultural differences.

87. On August 27, 2022, Lam ordered Plaintiff to leave campus.

88. Lam accused Plaintiff of threatening to kill Chaplinsky, which Plaintiff denied.

89. Lam shouted at Plaintiff, and Plaintiff shouted back.

90. On August 29, 2022, Clearwater Police were called to arrest Plaintiff on campus without justification.

91. Plaintiff was in medical student attire for a school photograph.

92. The officers were unaware Plaintiff was a student until they saw him.

93. The officers heard Plaintiff out and refused to arrest him.

94. An arrest would have terminated Plaintiff's studentship per NSU rules.

95. The false informant faced no consequences.

96. Based on those Police Harassments, a student who heard Plaintiff give a safety measure talk about campus safety reported Plaintiff to Federal Bureau of Investigation, FBI.

97. The FBI investigated and cleared Plaintiff of any threat.

98. Clearwater Police investigated and cleared Plaintiff of any threat.

99. Yet, NSU positioned police vehicles in front of school for 2 months signaling a potential threat.

100. NSU also had a policeman following Plaintiff around within 6 feet.

101. NSU's Human Resources hearing was unfair. Personnel provoked Plaintiff to portray him as volatile.

102. Plaintiff was banned from campus and from in-person academic programs by Dean Elaine Wallace for threatening to shoot a coworker.

103. Plaintiff's image was circulated as a dangerous individual per protocol.

104. Dr. Benjamin Johnson advised Plaintiff to accept a verdict of "disturbing the peace" to avoid dismissal from school.

105. Plaintiff accepted, though maintaining innocence in a required essay.

106. Plaintiff faced multiple administrative meetings and hearings.

107. These were often scheduled before key examinations to destabilize academic performance.

108. Plaintiff underwent mandatory psychiatric evaluations by Dr. Karl Backmann.

109. Dr. Backmann cleared Plaintiff of any mental illness and issued a fit-for-duty pass.

110. NSU withheld the actual evaluation report.

111. NSU mandated ongoing psychotherapy, particularly when Plaintiff mentioned Shane Lam or reported harassments.

112. A second psychiatrist, Dr. Elizabeth Robert, also cleared Plaintiff.

113. A private psychologist Plaintiff consulted found no issues.

114. Yet NSU continued to enforce therapy.

115. NSU placed a hold on Plaintiff's finances to compel compliance.

116. Chaplinsky continued harassing Plaintiff despite a cease-and-desist order from Dr. Benjamin Johnson.

117. That Chaplinsky violated Plaintiff's rights following the cease and deceased order before nearly every of the Plaintiff's examinations.

118. That before each school examination Chaplinksy is there forcing an interaction with the Plaintiff or those in close proximity to the Plaintiff.

119. That on one occasion Plaintiff was so angry he wanted to decline taking the Cardiovascular examination because of such forced interactions.

120. That Ms Manelle convinced Plaintiff to take the examination despite the provocation.

121. That this was reported to the University but Dr Johnson recommended mental focus and did not investigate nor rectify the situation.

122. This further led to another accident on the day of an OPP exam, which Plaintiff failed.

123. This increased Plaintiff's insurance costs, which he still bears.

124. On another occasion, Plaintiff recorded Chaplinsky's behavior and reported it.

125. NSU informed Chaplinsky of the recording, undermining Plaintiff's evidence.

126. Chaplinsky adjusted his behavior.

127. NSU commenced suspension proceedings in retaliation.

128. Thus NSU created a toxic academic environment to Plaintiff when they serially caused the problems and then created the solutions.

129. Plaintiff faced setups for sexual misconduct.

130. Chamonix Michoud invited Plaintiff to drink at her place in person and via text.

131. Plaintiff declined.

132. Monica Ayoub, a dental student, gave Plaintiff her number willingly after learning he was a student.

133. Their acquaintance ended after university interferences and rumors about her sexual orientation.

134. Miss Akel, another student, became hostile after initial friendliness.

135. Her behavior coincided with administrative scrutinies alongside external cohorts which failed.

136. Some female classmates/staff avoided Plaintiff or became over-familiar.

137. Some, like Natacha Villedrouin, exhibited inappropriate behavior before major examinations in late M2 years.

138. Natacha Villedrouin served on Plaintiff's SPC dismissal committee.

139. Associate Professor Kelsey Reidel acted amorously toward Plaintiff.

140. After Plaintiff rebuffed her, Reidel unfairly graded his Physical Diagnosis (PDX) assignment at 56/100, far below class average.

141. After scoring 95/100 on the next assignment well above class average and highest scores, Reidel was removed from Plaintiff's group.

142. Reidel later accused Plaintiff of exposing himself during an OPP exam where he was a standardized patient.

143. This contributed to Plaintiff's dismissal.

144. Dr. Anna Porter, Plaintiff's Biochemistry professor, was initially mistaken for a classmate in the first week of school.

145. A comment Plaintiff made to himself about her appearance was overheard and misconstrued.

146. This led to her heightened fear around Plaintiff.

147. Plaintiff clarified the misunderstanding twice.

148. Her husband or close friend, Dr. Gregg, served on Plaintiff's dismissal appeal committee.

149. This compromised fairness.

150. Classmates, including Travis Roundtree, Emily Thach, and Tyreek Gaynor-Fray, colluded to frame Plaintiff.

151. Roundtree and Thach deleted incriminating messages against them and exculpatory messages for Plaintiff.

152. They signed and emailed other students requesting incriminating evidence, backed by NSU administration.

153. Tyreek Gaynor-Fray accused Plaintiff of sorcery after his own dismissal from school.

154. Tyreek appeared on Plaintiff's Facebook page.

155. Facebook warned Plaintiff as required by law that it was an investigation.

156. Plaintiff informed NSU of Tyreek's behavior.

157. Tyreek rushed back to Facebook to delete evidence.

158. NSU not only failed to address these harassments but was complicit in their orchestration.

159. NSU violated Plaintiff's procedural and substantive due process rights under the 2023/24 NSU Student Handbook.

160. NSU dismissed Plaintiff on false academic grounds despite nonacademic SPC trials.

161. That the university tried to coerce me into self-incrimination.

162. Committee members with conflicts of interest, such as Dr. Gregg and Natacha Villedrouin, did not recuse themselves.

163. Over 18 months, NSU failed to address Plaintiff's repeated reports of harassments, mistreatments and discriminations.

164. This allegedly breached NSU's contract with Plaintiff as a student and employee.**

165. These actions caused Plaintiff financial losses, including over $265,000 plus ongoing interest in student debt.

166. These actions caused Plaintiff severe physical, psychological and emotional trauma.

167. NSU has a pattern of admitting protected class students to meet quotas only to find a way to eliminate them.

168. Examples include Jorge Quisoboni (52-year-old dental student), Kobe Maria Ellis (49 years old), and Plaintiff (46 years old at admission).

169. All were dismissed for flimsy reasons. I fought back the most.

170. Named individuals, including Dr. Shane Lam, Peter Chaplinsky, Kelsey Reidel, and others, conspired to defame and incriminate Plaintiff.

171. This culminated in Plaintiff's wrongful dismissal from NSU.

172. That following this dismissal Plaintiff suffered emotional and psychological breakdown for 10 days till December 25th, 2023.

173. That during these 10-day period the Plaintiff neglected himself and other activities of daily living.

174. That this neglect resulted in implacable toothache and infection which affected the contiguous left eyeball.

175. That this resulted in tooth extraction and treatment (+ possible future treatments) of the eye at the UPMC in August/Sept 2024 to prevent or correct ongoing blindness.

176. On September 18th, 2025, Plaintiff submitted a FERPA request for complete education records (Exhibit A: Email and Auto-Reply). NSU's auto-reply acknowledged receipt but provided no substantive response as of September 22nd, 2025. ***

177. This delay perpetuates the continuing violation by denying access to evidence of the 2022-2023 discrimination pattern.

---

**attached are items of evidence that establish contracts viz resignation of work appointment, admission offer and acceptance and

*** FERPA request.

## LEGAL BACKGROUND

This action arises under various federal civil rights statutes designed to prohibit discrimination in educational programs and employment, particularly those receiving federal financial assistance, as well as under Florida common law pursuant to supplemental jurisdiction. Nova Southeastern University, Inc. (NSU), as a private educational institution receiving federal funds through grants, student aid, and other assistance, is subject to these laws, which extend protections to students, employees, and individuals in dual roles such as student-employees. The following provides an overview of the key legal frameworks underpinning Plaintiff's claims.

### Federal Civil Rights Laws in Education and Employment

Federal laws enforced by agencies such as the U.S. Department of Education's Office for Civil Rights (OCR), the U.S. Equal Employment Opportunity Commission (EEOC), and the U.S. Department of Justice prohibit discrimination on protected grounds in higher education institutions. These statutes cover admissions, academic programs, student services, discipline, employment practices, and the creation of hostile environments. They apply broadly to entities like NSU, ensuring equal access and treatment without regard to race, color, national origin, sex, disability (including perceived disability), or age. Violations may involve intentional discrimination, disparate impact, deliberate indifference to harassment, or retaliation for reporting misconduct. Enforcement includes investigations, remedies such as reinstatement and damages, and private rights of action in federal court.

**Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.):**

This statute prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance, including higher education institutions. It extends to all operations of colleges and universities, as clarified by the Civil Rights Restoration Act of 1987, which overturned the program-specific limitation in Grove City College v. Bell, 465 U.S. 555 (1984). Title VI protects citizens and noncitizens alike, including undocumented individuals as "persons" under the equal protection clause (Plyler v. Doe, 457 U.S. 202 (1982)). In educational contexts, it addresses racial harassment, unequal resource allocation, and pretextual disciplinary actions motivated by animus (Alexander v. Sandoval, 532 U.S. 275 (2001)). NSU, as a recipient of federal funds, is liable for creating or tolerating a hostile racial environment.

**Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.):**

Title VII prohibits employment discrimination based on race, color, religion, sex, or national origin by employers with 15 or more employees, including universities. It covers all aspects of employment, such as hiring, firing, compensation, assignments, and working conditions, and prohibits hostile work environments and retaliation. For student-employees like Plaintiff, Title VII applies to overlapping educational and employment roles, protecting against discrimination in both capacities (e.g., harassment by supervisors or coworkers that affects job performance or academic progress). Universities like NSU are subject to Title VII regardless of federal funding status, though overlap with other laws (e.g., Title IX) may occur. Enforcement is through the EEOC, with a private right of action after administrative exhaustion.

**Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.):**

Title IX prohibits sex-based discrimination, including sexual harassment and gender stereotypes, in educational programs receiving federal financial assistance. It requires institutions to respond promptly and effectively to complaints, with liability for deliberate indifference to known harassment (Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999)). In higher education, it covers academics, extracurriculars, housing, and employment related to education. NSU's alleged false accusations of misconduct, retaliatory grading, and failure to address sex-based setups fall under this framework.

**Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794):**

This law prohibits discrimination on the basis of disability in programs receiving federal financial assistance, including higher education. It protects individuals with actual disabilities, those with a record of disability, or those "regarded as" having a disability (School Board of Nassau County v. Arline, 480 U.S. 273 (1987)). Requirements include reasonable accommodations, program accessibility, and protection from coerced medical interventions. In educational and employment settings, it addresses forced evaluations, disparate discipline, and hostile environments based on perceived mental health issues. NSU, as a federal fund recipient, must ensure nondiscriminatory practices.

**Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.):**

The ADA extends protections against disability discrimination, including perceived disabilities, across employment (Title I), state and local government programs (Title II), and public accommodations (Title III). Title I applies to employers like NSU with 15+ employees, prohibiting discrimination in job terms and requiring accommodations. Title II covers public entities (including public universities), while Title III applies to private institutions like NSU as places of public accommodation. It safeguards bodily autonomy by ensuring informed decision-making and prohibiting unnecessary medical intrusions. Enforcement involves the EEOC for Title I and the Department of Justice for Titles II and III.

**Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.):**

This act prohibits age-based discrimination (covering all ages) in programs or activities receiving federal financial assistance, including higher education institutions. It protects against exclusion, denial of benefits, or unequal treatment due to age, with exceptions for certain age-related policies if reasonably necessary. In NSU's context, it addresses derogatory comments, unequal opportunities, or retaliation tied to age in both student and employee roles. OCR enforces this law, with a private right of action available.

**42 U.S.C. § 1985(3) (Ku Klux Klan Act of 1871):**

This provision creates a civil remedy for conspiracies by two or more persons to deprive individuals of equal protection or privileges under the laws, motivated by class-based animus (e.g., race, sex, disability). It applies to private actors, including educational institutions, without requiring state action (Griffin v. Breckenridge, 403 U.S. 88 (1971)). In higher education, it covers coordinated efforts to harass, isolate, or dismiss based on protected characteristics. The statute is remedial, requiring proof of conspiracy and injury, but not always purposeful discrimination in certain clauses (e.g., the Support or Advocacy Clause). NSU's alleged administrative and student conspiracies fall within this scope.

**Supplemental Jurisdiction for State Claims**

Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's Florida common law claims (breach of contract, defamation, and intentional infliction of emotional distress), as they arise from the same nucleus of operative facts as the federal claims. Florida law recognizes implied contracts in student-university relationships (Jallali v. Nova Southeastern University, Inc., 992 So. 2d 338 (Fla. 4th DCA 2008)), defamation through false statements causing harm (Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098 (Fla. 2008)), and intentional infliction of emotional distress for outrageous conduct causing severe distress (Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985)). These laws collectively provide the foundation for Plaintiff's claims, ensuring accountability for NSU's alleged discriminatory, conspiratorial, and tortious conduct.

## IV. Legal Claims:

### Federal Claims

These claims arise under federal laws, providing jurisdiction in federal court under 28 U.S.C. § 1331.

**Count 1**: Conspiracy to Deprive Civil Rights under 42 U.S.C. § 1985(3). Ku Klux Klan Act of 1871.

**Legal Basis**: 42 U.S.C. § 1985(3) prohibits two or more persons from conspiring to deprive any person of the equal protection of the laws or of equal privileges and immunities under the laws, motivated by class-based animus. This statute, part of the Ku Klux Klan Act of 1871, applies to private actors such as Nova Southeastern University (NSU) per "Griffin v. Breckenridge," 403 U.S. 88 (1971).

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 177 above.

Defendant Nova Southeastern University (NSU), through its administrators, faculty, staff, and/or students, engaged in a conspiracy to deprive Plaintiff, a Black male student, of his civil rights, specifically his right to equal protection and access to educational opportunities, due to class-based animus based on race.

The conspiracy involved coordinated actions, including but not limited to:

- Isolating Plaintiff from practice partners and mentorship opportunities afforded to non-Black students.

- Subjecting Plaintiff to differential treatment in examination settings and disciplinary proceedings.

- Failing to investigate or address reports of racial harassment and abuse by co-workers and classmates.

- Executing a pretextual academic dismissal despite Plaintiff's good academic standing.

These actions were motivated by racial animus, as evidenced by:

- Warnings of administrative bias against Plaintiff.

- Denial of resources and opportunities provided to non-Black students.

- Derogatory comments directed at Plaintiff, such as being referred to as "Him" or "John John" due to cultural differences.

The conspiracy had a disparate impact on Plaintiff as the only older Black student in his cohort and created a hostile educational environment, depriving him of equal protection and privileges under the law.

As a direct and proximate result of NSU's conspiracy to violate Plaintiff's civil rights, Plaintiff suffered damages, including loss of educational opportunities, emotional distress, financial harm from student loans, and reputational injury.

**Count 2**: Violation of Title VI of the Civil Rights Act of 1964 (Intersectional)

**Legal Basis:** 42 U.S.C. § 2000d prohibits race-based discrimination in programs receiving federal funds per "Alexander v. Sandoval", 532 U.S. 275 (2001).

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 177 above.

Defendant Nova Southeastern University (NSU) receives federal financial assistance and is therefore subject to Title VI, which prohibits discrimination on the basis of race, color, or national origin in programs receiving federal funds.

Plaintiff, a Black male student, was subjected to intentional race-based discrimination by NSU administrators, faculty, staff, and classmates, including but not limited to:

- isolation from practice partners and mentorship opportunities;

- differential treatment in examination settings and disciplinary proceedings;

- failure to investigate reports of racial harassment and abuse by co-workers and classmates; and

- pretextual academic dismissal despite being in good standing.

- These actions were motivated by racial animus, as evidenced by warnings of administrative bias,

- denial of resources afforded to non-Black students, and derogatory comments (e.g., being called "Him" or "John John" due to cultural differences).

NSU's actions had a disparate impact on Plaintiff as the only older Black student in his cohort and created a hostile educational environment based on race.

As a direct and proximate result of NSU's violations, Plaintiff suffered damages, including loss of educational opportunities, emotional distress, financial harm from student loans, and reputational injury.

**Count 3**: Violation of Title IX of the Education Amendments of 1972. Sex Discrimination/Harassment.

**Legal Basis:** 20 U.S.C. § 1681 prohibits sex-based discrimination in education programs receiving federal funds which covers hostile environments and harassment if the institution is deliberately indifferent per "Davis v. Monroe County Bd. of Educ.", 526 U.S. 629 (1999).

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 177 above.

NSU receives federal financial assistance and is therefore subject to Title IX, which prohibits discrimination on the basis of sex in educational programs. Plaintiff was subjected to intentional sex-based discrimination and harassment by NSU faculty, staff, and administrators, including but not limited to:

- false accusations of Title IX violations without investigation;
- entrapment in sexual misconduct scenarios (e.g., orchestrated interactions with female students and faculty like Cham Michoud, Monica Ayoub, Miss Akel, and Kelsey Reidel);
- retaliatory grading and disciplinary actions following rejected advances; and a hostile environment where female classmates and faculty engaged in teasing, avoidance, or false reports (e.g., Reidel's accusation of exposure).

These actions were motivated by gender stereotypes and perceived romantic interests.

NSU failed to investigate or remedy Plaintiff's reports of sex-based harassment, instead retaliating against him through bans, forced evaluations, and dismissal.

As a direct and proximate result of NSU's violations, Plaintiff suffered damages, including academic dismissal, emotional trauma, and financial losses.

**Count 4:** Violation of Section 504 of the Rehabilitation Act of 1973 (Perceived Disability Discrimination)

**Legal Basis:** 29 U.S.C. § 794 prohibits discrimination on the basis of disability in programs or activities receiving federal financial assistance. This includes discrimination based on a perceived disability, as individuals who are "regarded as" having a disability are protected under 29 U.S.C. § 705(20), as established in "School Board of Nassau County v. Arline," 480 U.S. 273 (1987).

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 177 above.

Defendant Nova Southeastern University (NSU) receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of perceived disability in programs receiving federal funds.

Plaintiff, a Black male student perceived by NSU as having a disability, was subjected to intentional discrimination based on this perceived disability by NSU administrators, faculty, staff, and/or classmates, including but not limited to:

- Differential treatment in disciplinary proceedings compared to students not perceived as disabled.

- Forced psychotherapies through coercive financial holds and threat of dismissals.

- Intentional withhold of exculpatory evidence of Plaintiff's forced participation in therapies viz signed release of information (ROI).

- Conspiracy to entrap by requesting possessed results knowing it cannot be produced within requested time.

- Failure to investigate or address reports of harassment related to Plaintiff's perceived disability.

- Pretextual academic dismissal despite Plaintiff being in good academic standing, motivated by discriminatory bias against his perceived disability.

These actions were motivated by animus toward Plaintiff's perceived disability, as evidenced by:

- Derogatory remarks or dismissive attitudes targeting Plaintiff's perceived disability.

- Administrative bias warnings indicating prejudice against students perceived as disabled.

NSU's actions had a disparate impact on Plaintiff as a student perceived as disabled and created a hostile educational environment based on this perception.

As a direct and proximate result of NSU's violations of Section 504, Plaintiff suffered damages, including loss of educational opportunities, emotional distress, financial harm from student loans, and reputational injury.

**Count 5:** Violation of Title VII of the Civil Rights Act of 1964.Racial and/or Sex Discrimination in Employment.

**Legal Basis:** 42 U.S.C. § 2000e prohibits employment discrimination based on race.

Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 177.

As an employee of NSU, a recipient of federal funds and an employer subject to Title VII, Plaintiff was subjected to intentional discrimination based on race and/or sex.Specific acts include: e.g.,

- racial harassment by supervisors or coworkers, such as derogatory comments tied to race;

- sex-based harassments, such as false accusations of misconduct impacting Plaintiff's job; or

- retaliation for reporting discrimination.

These acts overlapped with discrimination in Plaintiff's student role, creating a hostile work environment and/or adversely affecting employment terms, conditions, or privileges.

NSU failed to investigate or remedy Plaintiff's reports of workplace discrimination, instead retaliating through forced psychotherapy, suspension and eventual dismissal.

As a direct and proximate result, Plaintiff suffered damages, including lost wages, emotional distress, and reputational harm.

**Count 6:** Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.): Prohibits discrimination based on age in programs or activities receiving federal financial assistance.

**Legal Basis:** 42 U.S.C. § 6101 et seq prohibits employment discrimination based on age.

Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 177.

As an employee of NSU, a recipient of federal funds and an employer subject to Age Discrimination Act of 1975, Plaintiff was subjected to intentional discrimination based on race, age and/or sex.Specific acts include: derogatory comments tied to age; false accusations of misconduct impacting performance; or retaliation for reporting discrimination.

These acts overlapped with discrimination in Plaintiff's student role, creating a hostile work environment and/or adversely affecting employment terms, conditions, or privileges.

NSU failed to investigate or remedy Plaintiff's reports of workplace discrimination, instead retaliating through forced psychotherapy, suspension and eventual dismissal.

As a direct and proximate result, Plaintiff suffered damages, including lost wages, emotional distress, and reputational harm.

**Count 7:** Violation of Title I of the Americans with Disabilities Act. Perceived Disability Discrimination in Employment.

**Legal Basis:** 42 U.S.C. § 12111 prohibits employment discrimination based on disability or perceived disability.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 177 above.

Defendant Nova Southeastern University (NSU) receives federal financial assistance and is therefore subject to Title I of the Americans with Disabilities Act which prohibits discrimination on the basis of perceived disability in programs receiving federal funds.

Plaintiff, a Black male student perceived by NSU as having a disability, was subjected to intentional discrimination based on this perceived disability by NSU administrators, faculty, staff, and/or classmates, including but not limited to:

- Differential treatment in disciplinary proceedings compared to students not perceived as disabled.

- Forced psychotherapies through coercive financial holds and threat of dismissals.

- Intentional withhold of exculpatory evidence of Plaintiff's forced participation in therapies viz signed release of information (ROI).

- Conspiracy to entrap by requesting possessed results knowing it cannot be produced within requested time.

- Failure to investigate or address reports of harassment related to Plaintiff's perceived disability.

- Pretextual academic dismissal despite Plaintiff being in good academic standing, motivated by discriminatory bias against his perceived disability.

These actions were motivated by animus toward Plaintiff's perceived disability, as evidenced by:Derogatory remarks or dismissive attitudes targeting Plaintiff's perceived disability. Administrative bias warnings indicating prejudice against students perceived as disabled.

NSU's actions had a disparate impact on Plaintiff as a student perceived as disabled and created a hostile educational environment based on this perception.

As a direct and proximate result of NSU's violations of Title I of the Americans with Disabilities Act. Plaintiff suffered damages, including loss of educational opportunities, emotional distress, financial harm from student loans, and reputational injury.

**Count 8:** Violation of Bodily Autonomy under the Americans with Disabilities Act (ADA)

**Legal Basis:** 42 U.S.C. § 12101 et seq., the Americans with Disabilities Act (ADA), protects against discrimination based on disability, including forced medical interventions that disregard a competent individual's choices. It supports autonomy by ensuring access to informed decision-making for individuals perceived as disabled, per School Board of Nassau County v. Arline, 480 U.S. 273 (1987).

Plaintiff realleges and incorporates by reference the allegations contained in the Statement of Facts.

NSU, subject to the ADA as a public accommodation and employer, violated Plaintiff's bodily autonomy by subjecting him to forced psychiatric evaluations and psychotherapy despite no medical evidence of mental illness. Specific acts include:

- Mandating psychotherapy sessions under threat of financial holds and academic dismissal, despite clearance by two psychiatrists (e.g., Dr. Karl Backmann and Dr Elizabeth Roberts).

- Coercing Plaintiff to answer suggestive questions during therapy (e.g., questions about self-harm or harming others) designed to portray him as mentally ill.

- Withholding exculpatory evidence (e.g., psychiatric evaluation results) to perpetuate the perception of disability.

These actions disregarded Plaintiff's autonomy and right to refuse unnecessary medical interventions, constituting discrimination based on a perceived disability. NSU's deliberate indifference to Plaintiff's objections and medical clearances exacerbated the violation. As a direct and proximate result, Plaintiff suffered damages, including emotional distress, financial harm from coerced therapy costs, and reputational injury.

**Count 9:** Willful Negligence: 20 U.S.C. § 1681, 42 U.S.C. § 2000e-5(g), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d., 29 U.S.C. § 623.

**Legal Basis:** Willful negligence occurs when a defendant knowingly or recklessly disregards a substantial and unjustifiable risk that harm will occur, resulting in injury to the plaintiff, as recognized under federal common law and applicable state tort law principles.

Plaintiff realleges and incorporates by reference the allegations contained in the Statement of Facts.

NSU and its agents, including Dr. Shane Lam, Dr. Benjamin Johnson, Dr. Kelsey Reidel, and others, acted with willful negligence by knowingly disregarding Plaintiff's reports of harassment, discrimination, and safety concerns, creating a substantial risk of harm. Specific acts include:

- Failure to investigate or address repeated reports of racial and sex-based harassment by coworkers (e.g., Peter Chaplinsky's verbal abuse) and classmates (e.g., derogatory comments and isolation).

- Ignoring warnings from Plaintiff and others (e.g., Ms. Stacy-Ann Payne) about a clandestine plot against Plaintiff, including false accusations and entrapment attempts.

- Allowing continued harassment by Peter Chaplinsky despite a cease-and-desist order, leading to Plaintiff's emotional distress and a car accident affecting his academic performance.

- Failing to ensure a safe educational and work environment, including neglecting to remove a security officer who falsely accused Plaintiff of threats, as required by adjudication.

NSU's reckless disregard for Plaintiff's safety and rights, despite ample notice of ongoing harm, constituted willful negligence. As a direct and proximate result, Plaintiff suffered damages, including emotional distress, financial losses from student loans and increased insurance costs, academic dismissal, and reputational harm.

## Supplementary Jurisdiction Claims (Florida Common Law)

### Count 10: Breach of Contract

- Legal Basis: Florida recognizes implied contracts between students and universities, governing academic and disciplinary processes, per Jallali v. Nova Southeastern University, Inc., 992 So. 2d 338 (Fla. 4th DCA 2008).

- Allegations: Plaintiff realleges and incorporates by reference the allegations in the Statement of Facts. NSU entered into an implied contract with Plaintiff as a medical student, promising a non-discriminatory educational environment and fair academic and disciplinary processes in exchange for tuition and compliance with university policies. NSU breached this contract by: failing to provide equal access to educational resources (e.g., practice partners, mentorship); subjecting Plaintiff to discriminatory treatment in examinations and disciplinary proceedings; ignoring reports of harassment; and dismissing Plaintiff pretextually for academic reasons despite good standing, violating NSU's 2023/24 student handbook. These breaches were willful and targeted due to Plaintiff's race, age, and perceived disability.

- Damages: Loss of educational opportunities, financial harm (including $265,000 in student loans), emotional distress, and reputational injury.

### Count 11: Defamation

- Legal Basis: Florida defamation requires a false statement, published to a third party, with negligence or malice, causing harm, per Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098 (Fla. 2008).

- Allegations: Plaintiff realleges and incorporates by reference the allegations in the Statement of Facts. NSU, through its administrators, faculty, and staff (e.g., Dr. Shane Lam, Dr. Kelsey Reidel), published false statements about Plaintiff, including accusations of Title IX violations, threats to kill co-workers, academic dishonesty, and mental instability, to third parties such as the Clearwater Police, FBI, classmates, and university personnel. These statements were made with reckless disregard for their falsity or with malice, as NSU failed to investigate Plaintiff's exculpatory evidence (e.g., work roster, psychiatric clearances) and ignored contradictory findings. The statements damaged Plaintiff's reputation, leading to his campus ban and social ostracization.

- Damages: Reputational injury, emotional distress, and financial harm.

## Count 12: Intentional Infliction of Emotional Distress

- Legal Basis: Florida recognizes intentional infliction of emotional distress (IIED) when conduct is outrageous, intentional or reckless, and causes severe emotional distress, per Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985).

- Allegations: Plaintiff realleges and incorporates by reference the allegations in the Statement of Facts. NSU's conduct, including false accusations of misconduct (e.g., Title IX violations, threats, academic dishonesty), forced psychotherapies despite medical clearance, campus bans, and orchestrated social isolation by classmates and staff (e.g., Peter Chaplinsky's harassment, classmates' derogatory comments), was outrageous and intentionally or recklessly inflicted severe emotional distress. NSU's failure to address Plaintiff's harassment reports and retaliation through disciplinary actions exacerbated the harm, targeting Plaintiff due to his race, age, and perceived disability.

- Damages: Severe emotional distress, financial harm, and reputational injury.

## Supplementary Jurisdiction Claims (NSU-KPCOM Student Handbook Policies)

### Count 13: Breach of NSU-KPCOM Student Handbook Policies on Dismissal

Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

The NSU-KPCOM Student Handbook for the 2023/2024 academic year provides detailed policies on academic and disciplinary dismissals, which apply to Plaintiff's enrollment and dismissal from Nova Southeastern University (NSU), Kiran C. Patel College of Osteopathic Medicine (KPCOM), Tampa Campus. These policies are found under the Code of Conduct and Academic and Curriculum Policies and Procedures sections and were breached by NSU in its handling of Plaintiff's case.

- **Academic Dismissal:**
  - Criteria: The handbook states that students may face dismissal for failing to maintain good academic standing, as outlined in the Academic Standing section.
    - This includes failing to achieve passing grades in required courses or clinical rotations;
    - not meeting remediation or reexamination requirements after failing a course or examination;
    - or violating academic integrity policies (e.g., plagiarism, cheating).
  - Process:
    - The handbook specifies that students who fail to meet academic standards may be placed on probation, and persistent failure can lead to dismissal.
    - The Student Progress Committee (SPC) evaluates cases of academic deficiency, and dismissal decisions are made following a review process, which may include a hearing.
    - The process requires fairness, including procedural and substantive due process, and committee members with conflicts of interest **must recuse themselves.**

**Violations in Plaintiff's Case:** Despite these policies, NSU wrongfully dismissed Plaintiff on December 16, 2023, citing "Academic Dismissal" on his final transcript, even though he was in good academic standing at the time.

- Plaintiff faced three SPC hearings—one for suspension and two for dismissal—which were strategically timed before or after major examinations to destabilize his performance and increase the likelihood of failure.

- Although tried for nonacademic reasons, including fabricated allegations of encouraging academic dishonesty (stemming from a misconstrued "cheat mode" comment in a private message to Neal Patel and unsolicited cheating solicitations from an individual named Brod that Plaintiff reported), NSU dismissed him on false academic grounds.

- For instance, Plaintiff's failures in Osteopathic Principles and Practice (OPP) examinations over 17 months were due to lack of practice partners, biased grading (e.g., denial of tips worth 3 marks each, except once), and external harassments, rather than genuine academic deficiency.

- He earned distinctions in Anatomy (6.5 credits) and Biochemistry (5 credits) in 2022, and his only non-OPP failure was an Endocrinology exam (3 credits) on September 19, 2023, taken while ill with COVID-19, with poorly formatted questions and unreadable diagrams.

- NSU failed to investigate the Brod incident and instead used it against Plaintiff. Committee members with conflicts, such as Dr. Gregg (husband or close friend of Dr. Anna Porter, with whom Plaintiff had a misconstrued interaction) and Natacha Villedrouin (an administrator who exhibited inappropriate behavior toward Plaintiff before major examinations in his second year), did not recuse themselves, compromising fairness.

- NSU also violated due process by withholding psychiatric evaluation reports (from Dr. Karl Backmann), while Dr. Karl Backmann and Dr. Elizabeth Robert, both cleared Plaintiff). NSU kept

  - mandating unnecessary ongoing psychotherapy,

  - placing financial holds to compel compliance,

- and failing to address over 18 months of Plaintiff's reports of harassment, discrimination, and mistreatment based on his age, race, and protected class status as a minority, underrepresented Black male.

- These actions breached the handbook's requirements for fair evaluation and remediation, as Plaintiff was not provided equitable opportunities to remediate, such as access to practice partners or unbiased grading, and was isolated (e.g., physically separated during exams, denied a mentee despite prior allowances, and subjected to monitoring by a Black female administrator during practice sessions with willing colleagues).

**Disciplinary Dismissal:**

- Criteria: The Code of Conduct lists specific violations that can lead to dismissal, such as

  - B.3 Assault/Violence (engaging in physical or verbal violence);

  - B.7 Disorderly Conduct (disrupting the learning environment or university operations);

  - B.10 Falsification/Fraud (providing false information or documentation); and

  - B.15 Noncompliance with University Officials (failing to comply with directives from faculty or administrators).

- Process: Disciplinary dismissals are handled through the University Disciplinary Procedures (Section D),

  - which include Student Judicial Resolution (SJR) as an informal resolution process;

  - Judicial Conference as a formal meeting to address allegations; and

- Administrative Judicial Proceeding as a hearing for serious violations, which may result in suspension or dismissal.

These procedures require fair hearings, protection against retaliation, and investigation of reported misconduct.

**Violations in Plaintiff's Case:** NSU breached these policies by pursuing disciplinary actions against Plaintiff based on false and retaliatory allegations, leading to his suspension and ultimate dismissal. As a Public Safety Officer from July 18, 2022, Plaintiff faced harassment from Dr. Shane Lam,

- including unfounded Title IX accusations in his second week (without Miranda rights or evidence, forcing retaking of a course),

- false claims of missing work despite Plaintiff working extra hours, and

- accusations of threatening coworker Peter Chaplinsky on August 25, 2022 (after Chaplinsky verbally abused Plaintiff, calling him "piece of shit" and telling him to "shut your mouth," which Plaintiff reported via Omnigo and email without response).

On August 27, 2022, Lam ordered Plaintiff off campus and falsely accused him of threatening to kill Chaplinsky, leading to an unjustified police call on August 29, 2022, where Clearwater Police refused to arrest Plaintiff after hearing his side.

NSU positioned police vehicles on campus for two months and had an officer follow Plaintiff, signaling him as a threat, despite clearances from Clearwater Police and the FBI (following a student's false report).

Human Resources hearings were unfair, provoking Plaintiff to portray him as volatile, and he was banned from campus by Dean Elaine Wallace for allegedly threatening to shoot a coworker, with his image circulated as dangerous.

Plaintiff accepted a "disturbing the peace" verdict on Dr. Benjamin Johnson's advice to avoid dismissal, despite innocence.

Further setups included false sexual misconduct allegations (e.g., from Chamonix Michoud, Monica Ayoub, Miss Akel, and Associate Professor Kelsey Reidel, who unfairly graded Plaintiff's Physical Diagnosis assignment at 56/100 after he rebuffed her advances and later accused him of exposing himself as a standardized patient).

Classmates like Miles Horton (who called Plaintiff "crazy," reneged on practice agreements, and liked a GroupMe message stating "Don't you get it? We don't want you in this class," liked by ~40 classmates),

Travis Roundtree, Emily Thach (who deleted messages and solicited incriminating evidence), and Tyreek Gaynor-Fray (who accused Plaintiff of sorcery post-dismissal and deleted Facebook evidence) colluded against him, with NSU's complicity and failure to investigate.

NSU retaliated with suspension proceedings after Plaintiff reported Chaplinsky's ongoing harassment (despite a cease-and-desist order), which caused an accident on an earlier OPP exam day, leading to failure and increased insurance costs.

These nonacademic issues were improperly conflated with academic performance, violating the handbook's separation of disciplinary and academic processes, and NSU failed to provide fair resolution through SJR, Judicial Conference, or Administrative Judicial Proceeding, instead orchestrating harassments and ignoring Plaintiff's reports.

NSU's breaches of the handbook policies constituted a breach of contract with Plaintiff as both a student and employee, as NSU has a pattern of admitting protected class students (e.g., Jorge Quisoboni, Kobe Maria Ellis, and Plaintiff, all older minority students) to meet quotas only to eliminate them on flimsy grounds.

These actions caused Plaintiff severe physical, psychological, and emotional trauma, as well as financial losses exceeding $265,000 in student debt plus interest. Plaintiff seeks compensatory and punitive damages, reinstatement, expungement of the dismissal from his record, and other relief as deemed appropriate.


**Count 14: Violation of FERPA (20 U.S.C. § 1232g) - Injunctive Relief to Enforce Compliance**

**Legal Basis:** 20 U.S.C. § 1232g (FERPA) grants students the right to inspect and review education records. While FERPA does not provide a private right of action for damages (Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)), courts may grant injunctive relief to enforce compliance under 42 U.S.C. § 1983 or equitable principles when denial is part of ongoing discrimination or retaliation. Plaintiff realleges and incorporates by reference the allegations contained in the Statement of facts above.

NSU has violated FERPA by withholding or delaying access to Plaintiff's education records, including disciplinary files, emails, and psych reports, despite the September 18, 2025, request. This denial perpetuates the discrimination pattern, as the records are needed to document Title VI/IX/Section 504 violations. As a direct result, Plaintiff suffered ongoing harm, including inability to mitigate reputational injury.

Plaintiff seeks injunctive relief to compel compliance with the FERPA request.

## V. Relief Sought

Plaintiff respectfully requests that this Court grant the following relief for all counts asserted herein, including but not limited the claim of Intentional Infliction of Emotional Distress (IIED), based on the unlawful actions of Defendant Nova Southeastern University, Inc. (NSU), including the pretextual academic dismissal, discrimination based on race, sex, age, and perceived disability, violations of bodily autonomy, breaches of contract, and the severe emotional and physical harm suffered as a result:

1. Declaratory Relief
   - A declaration that NSU's actions, including the pretextual academic dismissal, discrimination based on race, sex, age, and perceived disability, violations of bodily autonomy, and breaches of contract, were unlawful and in violation of federal and state laws, including Title VI, Title IX, Title VII, Section 504 of the Rehabilitation Act, the Age Discrimination Act, the Americans with Disabilities Act, 42 U.S.C. § 1985(3), and Florida common law.
   - A declaration that NSU's disciplinary processes, as applied to Plaintiff, violated procedural and substantive due process, and that the dismissal was arbitrary, capricious, and motivated by discriminatory animus, contributing to the severe emotional distress experienced.

2. Injunctive Relief
   - A permanent injunction requiring NSU to:
     - Reinstate Plaintiff as a medical student in good standing, allowing him to resume his studies without further discrimination or retaliation, including credit for courses completed and accommodations for delays caused by the wrongful dismissal.
     - Expunge all records of the dismissal, suspensions, disciplinary actions, and negative notations (e.g., "Academic Dismissal" on transcript) from Plaintiff's academic and employment records to mitigate ongoing reputational harm.
     - Cease all discriminatory practices against Plaintiff, including mandatory psychotherapies, campus bans, and harassment by staff or students.
     - Implement training programs for administrators, faculty, and staff on anti-discrimination policies, handling of harassment complaints, and respect for bodily autonomy in medical evaluations to prevent similar distress to others.
     - Prohibit any further contact or harassment by named individuals (e.g., Dr. Shane Lam, Peter Chaplinsky, Tyreek Gaynor-Fray) toward Plaintiff.

- An order compelling NSU to comply with the September 18th, 2025, FERPA request and award damages for any delay or denial.

## 3. Compensatory Damages

- Compensatory damages in an amount to be proven at trial, but not less than $265,000 for unreimbursed student loan debt incurred during enrollment, plus interest accruing thereon.
- Additional compensatory damages for:
  - Lost educational and career opportunities, including delayed or foregone income as a medical professional (estimated future earnings loss based on average physician salaries).
  - Lost wages from Plaintiff's employment as a Public Safety Officer at NSU, including any overtime or benefits withheld.
  - Out-of-pocket expenses, such as costs for private tutoring ($240 per session), psychological evaluations, legal fees related to prior proceedings, and increased insurance premiums due to an accident caused by distress (as alleged in the facts).
  - Severe emotional distress, pain, suffering, mental anguish, humiliation, and loss of enjoyment of life resulting from the hostile environment, isolation, false accusations, wrongful dismissal, and the 10-day psychological breakdown following dismissal (assumed late 2023 or early 2024).
  - Medical expenses, including reimbursement for past costs of tooth extraction and eye treatment due to the infection affecting the contiguous left eyeball, and future costs for treatments to prevent or correct ongoing blindness, estimated based on medical evaluations (to be documented).
  - Loss of quality of life due to neglect of daily living activities during the 10-day period and any lasting impact on Plaintiff's ability to work, study, or engage in personal life.

## 4. Punitive Damages

- Punitive damages in an amount sufficient to punish NSU for its willful, malicious, reckless, and intentional conduct, including the outrageous behavior leading to Plaintiff's emotional breakdown and physical harm (e.g., deliberate indifference to reported harassment or health), and to deter similar future violations, considering NSU's status as a large educational institution receiving federal funds.

## 5. Attorney's Fees and Costs

- Reasonable attorney's fees, expert witness fees, and costs of suit, as authorized under applicable federal statutes (e.g., 42 U.S.C. § 1988 for civil rights claims, Title VII, Title IX) and Florida law, applicable even as a pro se litigant if counsel is retained or statutory fees are awarded.

6. Other Relief
- Pre-judgment and post-judgment interest on all monetary awards at the maximum rate allowed by law to account for the delay in relief from the 2022-2023 events to the present (September 2025).
- Such other and further relief as the Court deems just, proper, and equitable under the circumstances, including any equitable remedies to mitigate ongoing harm to Plaintiff's professional reputation and future employability in the medical field.
- Plaintiff reserves the right to amend this complaints within 45 days of filing upon receipt of FERPA records from defendant to incorporate any additional evidence of retaliation or fraud.

## VI. Certification and closing.

I, Jones Adewale Ebenezer, certify that I will promptly notify the Clerk's Office of any changes to my mailing address for service of case-related documents in connection with the following CASE NO:                    . I understand that failure to maintain a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 17th of September, 2025.

___                             ___

**Signature of          Plaintiff**

Jones_Adewale_Ebenezer_
**Printed Name of Plaintiff:**